Susan TOMAI–MINOGUE, Appellant,

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellee.**

No. 84–1582.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 11, 1985.

Decided Aug. 19, 1985.

Fourteenth Amendments, a driver's license may not, once granted, be taken by the state without due process of law. The question is how much process is due. Here we conclude that the Virginia statute requiring suspension of licenses where motorists have failed to satisfy accident judgments affords sufficient procedural protection.

The Virginia Commissioner of Motor Vehicles suspended plaintiff Susan Tomai-Minogue's driver's license in 1983, at the request of defendant State Farm Mutual Insurance Co., for failure to satisfy a $230.90 automobile accident judgment entered in Maryland in favor of State Farm. Plaintiff sued State Farm for deprivation of due process under color of state law, pursuant to 42 U.S.C. § 1983 (1982), with additional state law claims of malicious prosecution and abuse of process.[1] The case was tried before a jury. At the conclusion of plaintiff's evidence, the district court granted defendant's motion for a directed verdict. Plaintiff appeals.

We affirm. To do otherwise would draw federal courts further into the administration of state motor vehicle laws in violation of controlling Supreme Court precedent. Plaintiff was not deprived of due process under the Fourteenth Amendment, as she had, but did not exercise, the right to a post-deprivation hearing in the Virginia courts on the inadequacy of personal jurisdiction to support the Maryland judgment. She had no constitutional right to a pre-deprivation hearing on that issue. Finally, the evidence presented was insufficient to create a jury question on the state law claims.

Kenneth Warren Smith, Fairfax, Va. (Smith & Gold on brief), for appellant.

Darryl L. Wyland, Washington, D.C. (Anderson, Quinn, Wyland, Yost & Scanlin, Washington, D.C., on brief), for appellee.

Before SPROUSE, WILKINSON and SNEEDEN, Circuit Judges.

WILKINSON, Circuit Judge:

This is the latest variation on a much-litigated theme: due process and the driver's license. A modern property interest, unknown to the horsedrawn and steam powered societies that debated the Fifth and

I

A. We begin with a brief review of the Virginia Motor Vehicle Safety Responsibility Act. Va.Code § 46.1–442(a) (1980) requires the Commissioner of the Division of Motor Vehicles to suspend the driver's li-

---

1. The state claims rested upon diversity as well as pendent jurisdiction. Plaintiff is alleged to be a Virginia resident, and defendant an Illinois corporation. These contentions are not disputed on appeal.

cense of any person who fails to satisfy any judgment against him within thirty days.[2] "Judgment" is defined to include, under Va.Code § 46.1–389(c) (1980), any judgment for $50.00 or more arising out of a motor vehicle accident because of injury to or destruction of property. Most important to this case, Va.Code § 46.1–443 (1980) requires that the judgment must be one "rendered by a court of competent jurisdiction of this State, any other state of the United States, the Dominion of Canada or its provinces."

The Motor Vehicle Safety Responsibility Act provides for no prior hearing by the Division of Motor Vehicles in the case of suspension for failure to satisfy a judgment. Va.Code § 46.1–437(a) (1980) authorizes an appeal within thirty days by any person aggrieved by an order of the Commissioner requiring suspension or revocation of a license to the Circuit Court of the City of Richmond or any court of record having jurisdiction where the person resides. This section further provides, however, that "[n]o appeal shall lie in any case in which the revocation of the license or registration was mandatory except to determine the identity of the person concerned when the question of identity is in dispute."[3] We assume, for purposes of this appeal, that the statutory language could reasonably have been construed to encompass suspensions as well as revocations.

B. The facts of this case are straightforward. On October 27, 1981, in Washington, D.C., plaintiff struck and damaged a parked car belonging to Richard Webster, who was insured by State Farm. The accident occurred outside the building where both Tomai-Minogue and Webster worked.

Plaintiff offered to pay for the damage, and at Webster's request wrote him a check for $100.00. Subsequently, Webster filed a claim with State Farm and was paid $230.90, covering the cost of repairs less the $100 deductible under the policy.

Following the accident, State Farm sought reimbursement from plaintiff for Webster's damage claim. Plaintiff received several written notices but did not respond. Eleven months after the accident, State Farm forwarded its subrogation claim to attorney Michael Miller for collection. Miller wrote to plaintiff but likewise received no response. Miller then filed suit in the District Court for Prince George's County, Maryland against Tomai-Minogue on October 25, 1982. The complaint stated that the accident occurred in Washington, D.C., and listed plaintiff's address as Falls Church, Virginia. Plaintiff received notice of the small claims action at her Virginia address, and, after consulting with her attorney, elected not to appear in the Maryland action. On February 9, 1983, the Maryland court entered a default judgment against Tomai-Minogue for $230.90.

State Farm next sought enforcement of its judgment in Virginia under the provisions of the Motor Vehicle Safety Responsibility Act. It forwarded a triple seal copy of the Maryland judgment to a Virginia attorney, Walter S. Boone, who sent the judgment to the Virginia Division of Motor Vehicles with the request that Tomai-Minogue's license be suspended, as State Farm had instructed. The Virginia DMV, pursuant to the Act, suspended plaintiff's driver's license effective June 6, 1983. Tomai-Minogue received notice of the suspension on June 13.

**2.** The suspension continues, unless otherwise provided, until the person satisfies the judgment and gives proof of future financial responsibility. Va.Code § 46.1–459(b) (1980).

**3.** This sentence was amended by the Virginia legislature in 1984, inserting the words "suspension or" preceding "revocation of the license." Va.Code § 46.1–437(a) (Cum.Supp.1984). At the time plaintiff's license was suspended, the statute only expressly limited appeals from a mandatory revocation. It is unclear, however,

whether the amendment was intended to alter prior law or simply to make explicit the original legislative intent. No Virginia case law addresses the question to our knowledge.

Of course, if the statute were strictly read to apply only to mandatory revocations and not suspensions, no question of denial of a post-deprivation judicial appeal would be presented, as the exception to the full right of appeal would be inapplicable.

Loss of her license finally bestirred To-mai-Minogue. She alerted her attorney, who in turn told Miller that the Maryland judgment was lacking in personal jurisdiction. Miller, after determining that jurisdiction was indeed wanting, since neither the place of the accident nor the residence or workplace of Tomai-Minogue was in Maryland, notified both State Farm and Boone. The Maryland judgment was vacated on July 12, 1983 at State Farm's motion. Boone requested the Virginia DMV to reinstate Tomai-Minogue's license on July 7, 1983, explaining the circumstances in a letter. Likewise, Tomai-Minogue's attorney wrote the DMV in September, 1983, requesting an end to the suspension and enclosing a triple seal copy of the order vacating the Maryland judgment. It is unclear precisely when the suspension was lifted, but this had been accomplished by September 1983. Plaintiff never actually surrendered her license, and she still drove on occasion while the suspension was in effect.

## II

■ We first consider what process Virginia law afforded plaintiff. In the next section, we determine whether more protection was due.[4]

■ The normal operation of the Virginia Motor Vehicle Safety Responsibility Act poses little constitutional difficulty. Though it is settled that a driver's license is a property interest which may not be suspended without some form of hearing, *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, permits Virginia to adopt, for purposes of its own compliance with due process, the

judgment of a court from another state. Ordinarily, the prior proceeding will have assessed fault arising from the accident, *see Bell*, 402 U.S. at 540, 91 S.Ct. at 1590, and rendered judgment on the merits. When the Commissioner suspends a license pursuant to Va.Code § 46.1–443, he can rest upon the authenticated copy of the prior judgment as proof that a pre-termination hearing has occurred.[5]

Tomai-Minogue's case, however, displays an unusual wrinkle. Like any defendant, she had the opportunity to appear in Maryland court either to contest jurisdiction or fault. The district court ruled that because plaintiff had the opportunity to make a special appearance in Maryland to challenge personal jurisdiction, due process required nothing more. We think this a questionable line of argument. For to assert her rights as a matter of procedural due process, Tomai-Minogue would be compelled to forego other due process rights, in particular the privilege not to appear in a jurisdiction lacking even minimum contacts. *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In other contexts, the Supreme Court has found it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968).[6]

■ We need not decide whether a state can rely on the opportunity for a special appearance in a foreign jurisdiction as the sole basis for depriving an individual of a property right. For contrary to plaintiff's evident assumption, examination of the relevant Virginia law reveals that Virginia would have entertained a post-depri-

---

4. Although State Farm is a private party, and plaintiff's suit is not directed against any state official, both "state action" for Fourteenth Amendment purposes and a deprivation "under color of state law" as required by § 1983 are present, following *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

5. There could, of course, remain a dispute as to whether the judgment had been satisfied. This

would presumably be handled under Virginia law in the same manner as the question of jurisdiction, *infra*.

6. The situation differs from that of waiver, when one voluntarily surrenders a constitutional right, not to assert another constitutional right, but to secure an obvious collateral benefit.

vation attack on the Maryland judgment for want of personal jurisdiction in its courts.[7]

Va.Code § 46.1–437(a) authorizes an appeal by any party aggrieved by the Commissioner's suspension of his license to the Virginia courts. Only where revocation is mandatory is no appeal permitted except on the narrow question of identity. Thus, the essential inquiry, in determining whether personal jurisdiction for the Maryland judgment could be appealed in a Virginia forum, is whether deprivation of the license is actually mandatory. Va.Code § 46.1–443 makes suspension of a license mandatory when a judgment "rendered by a court of competent jurisdiction" remains unsatisfied. Reading these provisions in conjunction, the jurisdiction of the court rendering the original judgment is a critical prerequisite to the Commissioner's obligation to suspend a license. If the court lacked jurisdiction, suspension is not mandatory, and the full right to appeal remains in force, unencumbered by any qualification.[8]

That Virginia courts would actually examine the jurisdictional basis of a judgment from another state before relying upon it

to uphold a license suspension is evident from *Lamb v. Butler*, 198 Va. 509, 95 S.E.2d 239 (1956), the most recent in a series of license deprivation cases decided by Virginia's highest tribunal. In *Butler*, the plaintiff sought to enjoin the Commissioner from enforcing an order temporarily revoking his driver's license. Revocation rested upon a provision of the state motor vehicle law making the Commissioner's action mandatory where the motorist had twice been convicted of speeding within twelve months. One conviction occurred in Virginia and was not questioned; the other offense occurred in North Carolina, and was proven by an abstract of conviction. The plaintiff had been stopped for speeding by North Carolina police, paid a fine at the time to local authorities, and did not contest the violation subsequently, so that judgment was effectively entered against him by default, payment of the fine being regarded as a guilty plea and the fine being forfeited. The Virginia Supreme Court of Appeals, in holding that the North Carolina proceedings amounted to a conviction, considered it necessary to determine the existence both of subject matter and personal jurisdiction for the North Carolina judgment. "The important questions are

7. Where jurisdiction is in dispute, the choice between a default and special appearance is crucial for purposes of a subsequent challenge to enforcement. A default judgment has *res judicata* effect when rendered by a court having both subject matter and personal jurisdiction, under the full faith and credit requirement. *Morris v. Jones*, 329 U.S. 545, 550–51, 67 S.Ct. 451, 455–56, 91 L.Ed. 488 (1947). Before a court is bound by a judgment rendered in another state, however, it may inquire into its jurisdictional basis, and if either personal or subject matter jurisdiction is lacking, full faith and credit is not owing. *Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guaranty Assn.*, 455 U.S. 691, 705, 102 S.Ct. 1357, 1366, 71 L.Ed.2d 558 (1982). Thus, a defendant sued in a foreign jurisdiction may, under *Baldwin v. Iowa State Traveling Men's Assn.*, 283 U.S. 522, 525, 51 S.Ct. 517, 518, 75 L.Ed. 1244 (1931), elect not to appear, thereby reserving the right to dispute jurisdiction subsequently, because the jurisdictional question has never been actually litigated.

In contrast, where the defendant makes a special appearance, and the jurisdictional issue has been fully and fairly litigated and finally

decided in the original forum, the resulting judgment is entitled to full faith and credit even as to the existence of personal and subject matter jurisdiction. *Underwriters*, 455 U.S. at 706, 102 S.Ct. at 1367; *Durfee v. Duke*, 375 U.S. 106, 111, 84 S.Ct. 242, 245, 11 L.Ed.2d 186 (1963); *Baldwin*, 283 U.S. at 525–26, 51 S.Ct. at 518. *See also* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, §§ 4430, 4442 (1981).

8. It is hardly likely that any legislature could intend, as the dissent proposes, to relieve its residents of foreign judgments void for lack of subject matter jurisdiction, while subjecting them to the same judgments where personal jurisdiction is lacking. Furthermore, to so presume would ignore the elementary principle of statutory construction that a statute not be given an unconstitutional interpretation unless clearly so indicated. *United States v. Morton*, — U.S. ——, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984), cited by the dissent, is inapposite, for the state statute there in question required that competent jurisdiction be determined from the "face" of the process, whereas no such language appears here.

whether the North Carolina Court had jurisdiction and whether Butler was properly before the Court." ˙ 95 S.E.2d at 246.

*Butler* must control here as well, for although the temporary revocation there rested on a different statute, it was equally subject to the broad rule of § 46.1–437 precluding appeals from mandatory revocations, except on matters of identity, which was in effect when *Butler* was decided.[9] We perceive no reason why the Virginia courts would treat a license deprivation for failure to satisfy an accident judgment differently from a similar deprivation for speeding. If plaintiff's assumption that § 46.1–437 accorded him no post-deprivation hearing on the jurisdictional question were correct, it would also have precluded the Virginia Supreme Court of Appeals from addressing the jurisdictional issue in *Butler.*

Both the statute and supporting case law plainly afforded Tomai-Minogue a post-dep-

rivation hearing in the Virginia courts on the question of the invalidity of the Maryland judgment for absence of personal jurisdiction.[10] She simply failed, whether through misunderstanding of the statute, lack of genuine interest or desire to strengthen her § 1983 action, to avail herself of that right.[11]

## III

 While Tomai-Minogue enjoyed an adequate post-deprivation remedy for suspension of her license, her § 1983 claim still requires us to determine whether she had a due process right to a pre-deprivation hearing on the jurisdiction of the Maryland court. Virginia provides no pre-deprivation hearing in these circumstances, but we conclude that no such hearing is constitutionally mandated.

The dispositive precedent is *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977). There the Court up-

---

**9.** Former Va.Code § 46–416.1, under which the license revocation in *Butler* occurred, was also part of the Motor Vehicle Safety Responsibility Act. In *Butler,* the Virginia Supreme Court of Appeals did not discuss the appeal limiting provision of § 46.1–437, then codified as § 46–424, but in light of three prior decisions by the same court interpreting the relevant language within the preceding six years, it is altogether implausible to suppose that the court was unaware of its consequences. *See Lamb v. Curry,* 197 Va. 395, 89 S.E.2d 329, 331 (1955); *Dillon v. Joyner,* 192 Va. 559, 66 S.E.2d 583, 584–86 (1951); *Scott v. Commonwealth,* 191 Va. 73, 60 S.E.2d 14, 15–16 (1950).

Both *Dillon* and *Curry,* relied on by the dissent, involved prior convictions from Virginia of in-state residents presenting no jurisdictional difficulty. We will not suppose that the Virginia Supreme Court intended, in *Dillon* and *Curry,* to resolve *sub silentio* a jurisdictional question with which it was not even confronted. Only *Butler,* which as the most recent decision is controlling, has actually found it necessary to consider whether another state's judgment was lacking in jurisdiction.

**10.** For a post-deprivation hearing to be meaningful, it must also be prompt. The Virginia statute shows every promise of expeditiousness by requiring that appeals be taken from the Commissioner's order within 30 days. Va.Code § 46.1–437(a). In any event, plaintiff cannot challenge the lack of promptness of a hearing she did not even request.

**11.** In addition to the opportunity to be heard, a fundamental requirement of due process is "notice reasonably calculated, under all the circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). *See also Bell,* 402 U.S. at 542, 91 S.Ct. at 1591; *Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020–21, 25 L.Ed.2d 287 (1970). "The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Mullane,* 339 U.S. at 314, 70 S.Ct. at 657 (citations omitted). We are convinced that under these circumstances both aspects of the notice requirement were satisfied. Tomai-Minogue received prompt written notice of the suspension from the DMV. That notice informed her clearly of the reason for the suspension, and cited the statutory authority for the Commissioner's action. As Tomai-Minogue was represented by counsel throughout these proceedings, and the right to a judicial hearing challenging the suspension could have been determined easily by consulting the statute and Virginia case law, we find that the notice conveyed adequate information to Tomai-Minogue about her rights. Furthermore, the notice allowed Tomai-Minogue to bring her judicial appeal well within the 30-day period pursuant to Va.Code § 46.1–437(a).

held an Illinois law providing for summary revocation of a driver's license following three suspensions for traffic offenses within a 10-year period, even though a full hearing could be had only after the revocation had taken effect. As here, the only issue in *Dixon* was one of timing of the hearing. 431 U.S. at 112, 97 S.Ct. at 1727. Since the Court did not require a pre-deprivation hearing in *Dixon*, there is likewise no justification for mandating one here.

The *Dixon* court resolved the motorist's claim under *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), which requires consideration of:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903, *quoted at* 431 U.S. at 112–13, 97 S.Ct. at 1727–28. The *Mathews* test, as adopted in *Dixon* for driver's license deprivation claims, represents some shift from the approach earlier followed by the Court in *Bell,* which mandated a pre-deprivation hearing, except in emergency situations, when a license was suspended. 402 U.S. at 542, 91 S.Ct. at 1591.

As the Court recognized in *Dixon,* the private interest in a driver's license is not "so vital and essential as are social insurance payments on which the recipient may depend for his very subsistence." 431 U.S. at 113, 97 S.Ct. at 1728. We do not disparage the importance of a driver's license in this day and time. We merely note that suspension is not an uncommon occurrence, that alternative arrangements are usually possible, and that the Court has expressly held that the interest is not so great as to require departure from the principle that

an evidentiary hearing is not ordinarily required prior to adverse administrative action. *Id.*

Nor do the remaining two *Mathews* factors command such a departure. Just as in *Dixon, id.* at 113, 97 S.Ct. at 1727, suspension for failure to satisfy an accident judgment is essentially automatic under Virginia law, with no element of discretion left to the Commissioner. The merits of the Maryland judgment could not be questioned in any Virginia proceeding, being due full faith and credit under the Constitution, Art. IV, § 1. The possible causes for erroneous deprivation, such as mistaken identity and lack of jurisdiction, are all remediable in the post-deprivation appeal. By a fortuity, plaintiff suffered an erroneous deprivation under the latter of these circumstances, but we will not hold a statute flawed merely because it works a temporary inconvenience in a singular case. Rather, we must decide whether according a right to a pre-deprivation hearing in license suspension cases based upon default judgments generally would "have significant value in reducing the number of erroneous deprivations." *Dixon,* 431 U.S. at 114, 97 S.Ct. at 1728. Plaintiff has made no showing whatsoever that erroneous suspensions are anything but rare.

The governmental interest at stake is hardly inconsequential. The statute aims to ensure that motorists are financially responsible and will satisfy promptly any judgments against them.[12] While that interest may seem slight where a parked car was bumped, it is anything but trivial when accidents involve loss of human life, injury to other motorists, and extensive property damage. Financial responsibility statutes are not simply designed to safeguard insurance companies, but serve the more general societal purpose of ensuring that those responsible for highway accidents pay the resulting losses without the necessity for cumbersome enforcement proceedings. Where an adverse judgment has not been satisfied by a motorist, Virginia has opted

---

**12.** The statutory interest is not lessened in the case of default judgments, which are like any other judgments except with respect to reservation of the question of jurisdiction.

to suspend the license now and discuss the matter later. We decline to undercut that legitimate choice by requiring the taking to be later and the talking to be first.

■ Dixon's observation that "the substantial public interest in administrative efficiency would be impeded by the availability of a pretermination hearing in every case," 431 U.S. at 114, 97 S.Ct. at 1728, is also applicable here. To suggest, as the dissent does, that the question of jurisdiction would yield to a "simple administrative inquiry," fails to recognize that the determination of *in personam* jurisdiction is often quite tangled. *See, e.g. Davis v. St. Paul-Mercury Indemnity Co.,* 294 F.2d 641 (4th Cir.1961).[13] A requirement that the Division of Motor Vehicles, the agency charged with administering the statute, hold pre-termination hearings on the mysteries of personal jurisdiction is not one we would lightly force upon the state. Even though the permissible grounds for a prior hearing might be confined to mistaken identity and want of jurisdiction, no clairvoyance is needed to predict that motorists would "routinely ... request full administrative hearings," *Dixon,* 431 U.S. at 114, 97 S.Ct. at 1728, merely to delay the loss of their driver's licenses, and that the quantity of spurious appeals might far outweigh the legitimate. By according only a post-deprivation hearing, Virginia ensures

that drivers who have truly suffered an erroneous deprivation have some remedy, while averting abuse of an administrative process by those with no purpose other than delay.[14]

Because a pre-deprivation hearing was not required when plaintiff's license was suspended, and an adequate post-deprivation remedy existed, plaintiff's § 1983 claim cannot prevail, as there has been no denial of due process.

## IV

Notwithstanding our disposition of plaintiff's § 1983 claim, her state law claims for malicious prosecution and abuse of process must be addressed as well, for they rest not merely on pendent jurisdiction but also on an independent diversity basis. It is uncertain whether Maryland or Virginia law would apply to these torts, encompassing actions by State Farm in both states. Nor are the parties in agreement, as cases from both jurisdictions are cited. We likewise find it unnecessary to determine which state's law governs, for it appears that the relevant principles accepted in both jurisdictions do not materially differ.

■ A. An action for malicious prosecution, or "malicious use of process" as it is called in Maryland where the proceeding complained of is civil, *see e.g. Wesko v.*

13. *In personam* jurisdiction over a nonresident motorist is not limited by physical presence or consent, but only by standards of fairness embodied in the due process clause of the Fourteenth Amendment. *Davis v. St. Paul-Mercury Indemnity Co.,* 294 F.2d 641, 646 (4th Cir.1961). In *Davis,* the insured motorist, whose residence was in Texas, purchased an automobile which she lent to her minor son stationed as a Marine at Camp Lejeune, North Carolina, who was covered under the policy terms. A resident of North Carolina was killed by this automobile while it was being driven with the son's permission by a fellow Marine. Judgment by default was obtained against the insured motorist in a suit in North Carolina after statutory substituted service. The motorist had knowledge of the suit, as did her insurance company, which elected not to defend. Unable to collect on the judgment from the debtors, the administratrix of the deceased's estate brought suit against the insurance company in district court. The crucial question was whether the insured had suffi-

cient minimum contacts with North Carolina under the standard of *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) for that state to exercise jurisdiction over the insured. While this circuit ultimately determined that jurisdiction existed, 294 F.2d at 648, the complexity of the analysis involved only serves to emphasize why the burden of the jurisdictional inquiry should not rest with an administrative agency under the pressures of a pre-suspension hearing.

14. The dissent neglects to apply the three part balancing test required by *Mathews* and *Dixon,* and simply seeks to categorize cases as involving financial responsibility or motor safety statutes. In so doing, the dissent would also scuttle a critical distinction between this case and *Bell.* In *Bell,* suspension was mandated without any prior determination of the motorist's fault, whereas here suspension occurs only after a judgment of fault.

*G.E.M., Inc.*, 272 Md. 192, 321 A.2d 529, 531 (1974), requires proof of several elements to prevail. These are: 1) that a prior proceeding was instituted by the defendant; 2) that the proceeding was instituted without probable cause; 3) that the proceeding was instituted with malice; 4) that the proceeding terminated in favor of the plaintiff in the present action; and 5) that the plaintiff sustained special damages as a result of the prior proceeding. *Hooke v. Equitable Credit Corp.*, 42 Md.App. 610, 402 A.2d 110, 113 (1979); *Herring v. Citizens Bank & Trust Co.*, 21 Md.App. 517, 321 A.2d 182, 194, *cert. denied*, 272 Md. 742 (1974). *See also Gaut v. Pyles*, 212 Va. 39, 181 S.E.2d 645, 646–47 (1971); *Giant of Virginia, Inc. v. Pigg*, 207 Va. 679, 152 S.E.2d 271, 275 (1967); *Wiggs v. Farmer*, 205 Va. 149, 135 S.E.2d 829, 831 (1964); *National Surety Co. v. Page*, 58 F.2d 145, 148 (4th Cir.1932); 12A Michie's Jurisprudence, *Malicious Prosecution* § 15 (1978).

Special damages entail some arrest of the person, seizure of property, or other injury which would not ordinarily result in all civil actions. *Hooke*, 402 A.2d at 113; *National Surety*, 58 F.2d at 148. Assuming for purposes of this action that seizure of a license constitutes the requisite special damages, we nonetheless think that a directed verdict for defendant on plaintiff's malicious prosecution claim was proper, because plaintiff failed to present sufficient evidence that probable cause for State Farm's action was wanting.[15] Probable cause in a civil action is defined as "a reasonable ground for belief in the existence of such a state of facts as would warrant institution of the suit or proceedings complained of." *Herring*, 321 A.2d at

194–95, *quoting Owens v. Graetzel*, 149 Md. 689, 132 A. 265, 267 (1926). *See also Giant*, 152 S.E.2d at 276 (similar standard for criminal prosecution). The flaw in plaintiff's case is that State Farm obviously had probable cause to try to collect from Tomai-Minogue the damages suffered on its insured's subrogation claim, because there was every reason to believe that the debt was legitimate.

State Farm thus acted entirely within its rights in bringing a civil suit against Tomai-Minogue. Its only error was a procedural one, in selecting a forum without jurisdiction over her person, and this is irrelevant to the injury plaintiff sustained. Lack of probable cause to bring the underlying action cannot be inferred from nothing more than a jurisdictional error. Had State Farm brought a proper suit against Tomai-Minogue in Virginia, she would have suffered the same consequences of suspension of her license had she refused to pay her debt. If anything, State Farm only injured itself by bringing suit in the wrong jurisdiction, thereby postponing collection of its claim. Moreover, when State Farm learned of its mistake, it moved promptly to vacate the judgment and reinstate the license. Plaintiff had every opportunity at trial to present evidence of the nefarious motives about which the dissent speculates, yet she manifestly failed to do so. We will not allow a simple procedural mistake to be elevated into a malicious prosecution where the merits of the underlying claim are unquestioned.[16]

B. Abuse of process, under both Maryland and Virginia law, is a species of tort action distinct from malicious

**15.** Malice, in the legal sense employed in malicious prosecution claims, requires no distinct proof but may be inferred from want of probable cause. *Hooke*, 402 A.2d at 114; *Giant*, 152 S.E.2d at 276. Thus, we need not consider that element directly, and focus instead on the question of probable cause.

**16.** The dissent's suggestion that State Farm had no claim against Tomai-Minogue because Webster had settled is contrary to basic principles of insurance law. Webster did not settle anything other than his personal claim against Tomai-Mi-

nogue for $100. By electing to file a claim with his insurer for the remainder of his damages, he necessarily subrogated to State Farm his right to recover that sum from Tomai-Minogue, under the pre-existing insurance contract. Even if there were evidence that Webster intended Tomai-Minogue's $100 payment to represent full satisfaction of his loss—and there is not—Webster could not compromise the insured portion of his loss to the detriment of his insurer without State Farm's consent.

prosecution or use of process. While malicious prosecution concerns institution of process for its ostensible result but without probable cause, abuse of process is the improper use of otherwise regularly issued process in a manner not contemplated by law after its issuance. *Ross v. Peck Iron & Metal Co.*, 264 F.2d 262, 267 (4th Cir. 1959); *Herring,* 321 A.2d at 189. The essential elements of abuse of process are: 1) an ulterior purpose; and 2) a willful act in the use of the process not proper in the regular course of the proceeding. *Palmer Ford, Inc. v. Wood,* 298 Md. 484, 471 A.2d 297, 311 (1984); *Mullins v. Sanders,* 189 Va. 624, 54 S.E.2d 116, 121 (1949). Proof of absence of probable cause for the original proceeding is unnecessary, *Herring,* 321 A.2d at 189, nor is it required to show that process was issued maliciously. *Mullins,* 54 S.E.2d at 121.

State Farm's objective in bringing its civil suit in Maryland, and then requesting suspension of plaintiff's license in Virginia, was to compel payment of plaintiff's debt. This is precisely the purpose of the state procedures in question. Civil process designed to aid debt collection may be employed for the object contemplated by law without incurring the threat of an abuse of process suit. Suspension of a driver's license where an accident judgment is outstanding under the Virginia statute is manifestly intended to enable the creditor to satisfy his judgment, for the suspension is lifted once the judgment is paid. It is irrelevant, for purposes of an abuse of process claim, that State Farm brought suit in the wrong jurisdiction, since an action of this sort, unlike malicious prosecution, does not concern itself with the validity of the original process. Because no unlawful "collateral object," *Ross,* 264 F.2d at 268, was present, a directed verdict for defendant on plaintiff's abuse of process was proper.

## V

It would be tempting to pursue the course of the dissent and cast a large insurance company as the villain of the piece, while making of Tomai-Minogue a martyr. Yet such portraits must be drawn from more than our own imaginations. Plaintiff had every opportunity at trial to present any evidence of "motives of exasperation, frustration, or even vengeance ... in the offices of far removed employees or agents" of the State Farm Mutual Insurance Co. She demonstrably failed to do so, and that is why the district judge directed a verdict for defendant. In our system of law, juries are not entitled to consider a tale of woe without supporting evidence.

At trial, the court characterized this case as "a monument to trivia," one that "should never have been brought." In one sense, the court spoke too hastily. Trivial disputes do, on occasion, raise principles of constitutional import. In the larger sense, however, we share the trial court's frustration that this misunderstanding, which at any one of several junctures could have been resolved informally, has made its way to court. Tomai-Minogue conceded that the damage to Webster's car was entirely her fault. The debt to State Farm was evidently legitimate, and the company tried to collect it without going to court. Yet the energy that could not be expended by plaintiff in answering any one of four letters from State Farm could be mustered to pursue this § 1983 suit to the Court of Appeals.

Whether one can bring a lawsuit is not always the same question as whether one should. Perhaps it is enough to note that, for better and for worse, the modern contours of due process owe as much to contemporary attitudes toward dispute resolution as to this country's journey from horse through rails to the automobile.

The district court's judgment for defendant is

AFFIRMED.

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent. The district court, and to some extent the majority opinion, denigrate Tomai-Minogue's lawsuit against the insurance company as a pursuit of triv-

ial rights. I disagree both with the characterization of the nature of her suit and with the majority's construction of the controlling principles of constitutional law. I cannot agree that *Dixon v. Love*, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977), denies her the right to a pre-deprivation opportunity to show that the Maryland judgment was void nor that the Virginia statute provided Tomai-Minogue with an adequate opportunity for a post-deprivation hearing. I also feel that the district court erred in dismissing her malicious prosecution action.

## I.

Tomai-Minogue was entitled to some pre-deprivation opportunity to have the validity of the Maryland judgment considered.

The majority relies heavily on *Dixon v. Love* for its conclusion that the fourteenth amendment plays only a limited role in resolving Tomai-Minogue's grievance. I agree that due process protection for holders of driver's licenses is finely structured as a result of the Supreme Court's decisions in *Dixon* and *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). I think, however, the majority misconstrues those decisions and their impact on this case. The essential basis of my disagreement with the majority is its failure to appreciate that *Dixon* considered revocation of a license for violation of road safety laws while *Bell* involved revocation for violation of financial responsibility laws. The Supreme Court, in adopting the *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), balancing test in *Dixon*, 431 U.S. at 112–13, 97 S.Ct. at 1727–28, recognized the primary importance of the public interest in road safety and minimized the comparative importance of financial responsibility laws balanced against the erroneous deprivation of a right to drive an automobile. The Court left intact the *Bell* rule requiring some pre-deprivation right to be heard for the latter type of revocation. In *Bell* the district court considered a Georgia statute

that required suspension of a driver's license after an accident unless the licensee established financial responsibility to pay for any judgment that might result from damages caused by the accident. The Court reasoned that the licensee, although not entitled to a full pre-deprivation hearing, was entitled to a pre-deprivation inquiry "limited to the determination whether there is a reasonable possibility of judgments in the amount claimed being rendered against the licensee." 402 U.S. at 540, 91 S.Ct. at 1590.

The court in *Dixon* did not overrule *Bell*. To the contrary, it was cited with approval and found "fully distinguish[able]." *Dixon*, 431 U.S. at 114, 97 S.Ct. at 1728. It is true, as stated by the majority, that in license revocation cases our inquiry must focus on "how much due process" is required in these cases. The majority also correctly notes that in *Dixon* the court used the *Mathews* criteria in determining this question. What the majority overlooks, however, is that *Dixon* involved revocation of a driver's license for safety violations, and the Court took pains to emphasize that the result might have been different if the revocation had been for financial responsibility purposes. *Dixon*, 431 U.S. at 114–15, 97 S.Ct. at 1728–29. There is no question that Tomai-Minogue's license was revoked pursuant to the financial responsibility sections of Virginia's Motor Vehicle Code. Sections 46.1–417 through 46.1–441.2 of the Virginia Code provides for revocation for violations such as reckless or drunken driving, and for revocation of the licenses of mentally incapacitated individuals—all of which relate to driving safety. Section 46.1–442, *et seq.*, however, are financial responsibility provisions requiring revocation for failure to satisfy judgments. As State Farm states in its brief, "[i]n this case, State Farm decided to enforce the judgment through Virginia financial responsibility statutes Va.Code 46.1–442–443." The majority, likewise, emphasizing the nature of the proceeding against Tomai-Minogue, states:

State Farm's objective in bringing its civil suit in Maryland, and then requesting suspension of plaintiff's license in Virginia, was to compel payment of plaintiff's debt. This is precisely the purpose of the state procedures in question. Civil process designed to aid debt collection may be employed for the object contemplated by law without incurring the threat of an abuse of process suit. Suspension of a driver's license where an accident judgment is outstanding under the Virginia statute is manifestly intended to enable the creditor to satisfy his judgment, for the suspension is lifted once the judgment is paid.

The Georgia statute considered in *Bell* required proof of financial responsibility before judgment, while the Virginia statute we consider created revocation procedures to aid judgment creditors in their collections. That difference in degree does not alter application of the *Bell* rationale, undisturbed by *Dixon*, requiring some pre-determination opportunity when a license is revoked as an aid to judgment collection. The Supreme Court has made a sharp distinction between due process requirements for revocations based on convictions for safety violations and those brought about solely to assist one party to an accident in collecting damage judgments. The Court, in discussing the three *Mathews* criteria, emphasized that the most important one implicated in *Dixon* was the governmental interest—in that case "public interest in safety on the roads and highways, and in the prompt removal of a safety hazard." The Court further explained:

This factor fully distinguishes *Bell v. Burson, supra*, where the "only purpose" of the Georgia statute there under consideration was "to obtain security from which to pay any judgments against the licensee resulting from the accident.... In contrast, the Illinois statute at issue in the instant case is designed to keep off the roads those drivers who are unable or unwilling to respect traffic rules and the safety of others.

We conclude that the public interests present under the circumstances of this case are sufficiently visible and weighty for the State to make its summary initial decision effective without a predecision administrative hearing.

*Dixon*, 431 U.S. at 114–15, 97 S.Ct. at 1728–29 (citation and footnote omitted).

It would take considerable straining to conjure much of a difference in interest the public might have in providing security for the collection of a contingent judgment (as in the Georgia statute) and in ensuring that the final judgment was actually collected (as in the Virginia statute). Essentially, the two statutes embody the same public interest. The Court in *Bell* did not consider that public interest sufficient to override a licensee's right to some pre-deprivation consideration.

I agree with the majority that requiring full pre-deprivation hearings in these cases would impose an intolerable burden on the administration of the motor vehicle laws and certainly would throw the *Mathews* scales out-of-balance. The Supreme Court recognized this in *Bell*, however, even before it adopted in *Dixon* the *Mathews* criteria for resolving driver's license revocation cases. In cases like this one, an opportunity to have the appropriate administrator meaningfully consider the void judgment might be sufficient. Given some concise objection readily provided by a licensee alerted by adequate pre-deprivation notice, an administrator could decide the issue by a simple administrative inquiry. *See Bell v. Burson*, 402 U.S. at 540, 91 S.Ct. at 1590.

## II.

**The Virginia statute does not provide for a post-deprivation hearing.**

The majority concedes that Tomai-Minogue was entitled to due process protection but opines that she is sufficiently protected by a post-deprivation hearing after her driver's license was revoked. It then concludes that the Virginia statutory scheme provided her an opportunity at

such a post-deprivation hearing to show that the Maryland judgment was void, and to have her license restored at that time. I have indicated my opinion that Tomai-Minogue was entitled to some pre-deprivation opportunity but assuming for the moment that a post-deprivation hearing could provide her all the due process to which she was entitled, I am persuaded that the Virginia statutory scheme does not provide even a constitutionally adequate post-deprivation hearing.

Virginia Code section 46.1–437(a) (1980) provides:

No appeal shall lie in any case in which the revocation of the license or registration was mandatory except to determine the identity of the person concerned when the question of identity is in dispute.

The Supreme Court of Virginia has twice considered identical language in predecessor statutes and each time has held directly that the only issues permitted to be treated in such post-deprivation hearings are issues relating to the identity of the licensee.

In *Dillon v. Joyner*, 192 Va. 559, 66 S.E.2d 583 (1951), the driver whose license had been revoked contested the validity of a predicate conviction for reckless driving. Like section 46.1–437(a), the section construed in *Dillon* read:

No appeal shall lie in any case in which the revocation of the license or registration was mandatory except to determine the identity of the person concerned when the question of identity is in dispute.

The Virginia court said:

The narrow issue now presented is whether a person, whose license to drive a motor vehicle has been revoked by the Commissioner of the Division of Motor Vehicles, based upon convictions on two offenses of reckless driving within twelve consecutive months, can raise the question of the validity of the judgments in a proceeding instituted under section 46–424 of the Code of 1950, where the judgments are valid on their face, and where there is no question as to the

identity of the person involved. Our answer to this is in the negative.

There is no review under section 46–424 where the revocation was mandatory, except on the question of identity.

192 Va. at 561, 563, 66 S.E.2d at 584, 586.

Four years later the Virginia court decided *Lamb v. Curry*, 197 Va. 395, 89 S.E.2d 329 (1955). A driver's license had been revoked for the combination within a twelve-month period of a reckless driving conviction and a speeding conviction. The mandatory provisions requiring revocation for these two offenses became effective after both underlying convictions. The driver contested the mandatory revocation, contending that it was applied *ex post facto* to him in violation of the Virginia Constitution. The Virginia court refused to consider the merits of even a validly presented constitutional argument, holding that the court was limited to considering issues of identity. Approving its previous language expressed in *Dillon*, it went on to state:

Under the certain and mandatory language of § 46–424 and the authority of *Dillon v. Joyner, supra,* it is clear that the issues sought to be presented by Curry on this appeal could not be considered by the court. The character of the offenses for which he was convicted limited the inquiry on appeal under § 46–424 to one of identity. The demurrer should have been sustained and the appeal dismissed.

The majority relies on *Lamb v. Butler*, 198 Va. 509, 95 S.E.2d 239 (1956), to support its position that the Virginia Supreme Court would interpret section 46.1–437(a) to allow a hearing on the question of personal jurisdiction. The quick answer to that is that *Butler* did not construe or make any observation on the language of that section, whereas *Dillon* and *Curry* were direct holdings on the very question we consider—holdings squarely contrary to the position taken by the majority. Apparently, the Virginia court considered the facts in *Butler* not controlled by the statutory limiting language, perhaps because it in-

volved the question of whether a conviction even existed. At any rate, it was decided outside the context of the statutory language limiting the issues on appeal to identity, and the definitive cases on that language, *Dillon* and *Curry,* were not even mentioned in *Butler.*

With all respect, I also think the majority confuses a venerable term of art with elementary proceedings concerning the determination of personal jurisdiction. The sections of the Virginia motor laws with which we deal repeatedly refer to judgments "rendered by a court of competent jurisdiction." Under this the majority believes that Tomai-Minogue could have shown that the Maryland court was not "competent" because she was not personally before it. This attributes to the Virginia Legislature the intent to encompass the concept of in personam jurisdiction into the term. Understandably, the issue has not been frequently litigated, but the normal reference of the phrase "courts of competent jurisdiction" is to courts which have subject matter jurisdiction. *United States v. Morton,* — U.S. ——, —— – ——, 104 S.Ct. 2769, 2772–73, 81 L.Ed.2d 680, 687–88 (1984). A legislature uses a word or expression in its usually understood sense unless it expresses an intention to the contrary. *American Tobacco Company v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). There is no such expression in these statutes.

I share with the majority an apparent sense that a capable legislature such as that of the State of Virginia simply would not have purposefully enacted a scheme whereby its citizens could lose their drivers' license on the basis of a void judgment entered in a minor court of another jurisdiction. In the myriad of details that might be administered in policing over-the-road drivers, however, even the most conscientious legislature could be guilty of an oversight. The reason here is administrative expediency. As the Virginia Supreme Court said in *Dillon:*

In the course of a single year the Division of Motor Vehicles will process eighty or ninety thousand reports of convictions furnished to it in the form of abstracts by the clerks of the courts throughout the Commonwealth. The abstracts of conviction are presumed to be correct, and if they are valid on their face as was true in the instant case, the Commissioner cannot question their validity.

66 S.E.2d at 583. The Virginia Supreme Court said again in *Butler:*

The integrity of the judicial process would be set at stake if judgments valid on their faces should be voided by actions of administrative officers or by the opinions of executives or officers of the government to the effect that they are invalid.

95 S.E.2d at 247.

True, the burden of administration is one factor to weigh in the *Mathews* due process balancing test. As the United States Supreme Court held in both *Bell* and *Dixon,* however, it is but one of several important factors. The majority concedes that in the face of administrative burdens implicit in this important governmental function, a private citizen is entitled to at least a post-deprivation hearing in satisfaction of his due process rights. In my view, the Virginia legislature and Virginia Supreme Court have deferred too much to the State's administrative burden and, in this discrete area, have overlooked the constitutional right of Virginia license holders to even a post-deprivation hearing.

### III.

**Tomai-Minoque should have been allowed to pursue her malicious prosecution claim.**

Finally, I think the district court erred in directing a verdict on Tomai-Minogue's malicious prosecution claim. The majority accurately summarized the factual underpinnings necessary to sustain this claim but

concluded that State Farm had "probable cause" to bring their action against Tomai-Minogue. Probable cause is defined as "a reasonable ground for belief of such a state of facts as would warrant institution of the suit or proceedings complained of." *Herring v. Citizens Bank & Trust Co.*, 21 Md.App. 517, 539, 321 A.2d 182 (1974) (quoting *Owens v. Graetzel*, 149 Md. 689, 696, 132 A. 265 (1926)).

In the first place, I think it would defeat the purpose of the definition of probable cause to limit the concept of "state of facts" to facts relating only to the substantive merits of the controversy. State Farm had no independent claim against Tomai-Minogue—it was subrogated only to whatever claim its insured, Webster, had against her. He may have had no claim against her and State Farm took no steps to ascertain this. An experienced claims administrator, nevertheless, instructed a compliant attorney to pursue an action against her which even a law student should have known was void for lack of personal jurisdiction. The suit regarding an accident occurring in the District of Columbia was pursued in Maryland against a Virginia resident. A jury could have inferred that all of this amounted to lack of probable cause to pursue the action. The sometimes deviant practices of the now ancient justice-of-the-peace system is not yet so blurred in memory that we are not alert to the possibility of these practices in other minor judicial systems. A large and respected company like State Farm certainly would not countenance such practices in the pursuit of small claims. But who is to know if motives of exasperation, frustration, or even vengeance, might not surface in the offices of far removed employees or agents. These are matters for juries to determine.

It is true that Tomai-Minogue suffered no great out-of-pocket monetary damage. She was, however, a real estate salesperson, who, needing her car, perhaps lost two months' opportunity for commissions. She suffered the embarrassment, fear, and chagrin of a citizen deprived of long accepted constitutional rights. A jury might not have considered her case worthy of a large damage award. That, however, should have been left to the prerogative and responsibility of the jury. I agree with the practically universal feeling that federal courts are overburdened—frequently with frivolous litigation—and that frivolous litigation should be summarily treated and sanctions imposed where appropriate. I do not, however, associate with the castigation cast by the district court and the majority on Tomai-Minogue for bringing this action. I do not think this is a frivolous case. She may well have felt that the deprivation of her constitutional rights was intentional. It might have been. Many constitutional principles have evolved from resolution of less egregious violations. We should be slow to criticize our citizens for using federal courts for the purposes for which they were designed or to limit access to courts on preconceived hierarchical concepts of personal rights.

To be sure Tomai-Minogue candidly admitted fault. She struck Webster's car in a parking lot and caused a dent. The size of the dent and her dereliction may be gauged from the size of the repair bill which, in these times of inflated automobile repair bills, represents minor damage indeed. The extent of the damage or absence of it, however, was only the start of a scenario that, innocent at first, eventually developed into a fairly serious intrusion on Tomai-Minogue's rights. This was despite Tomai-Minogue's attempt to rectify her error. She spent considerable time finding Webster and, having found him, paid him the $100 that he asked for damages. She thought she settled with Webster for the damage. State Farm had no relationship with Tomai-Minogue. The only right it would have had to sue her anywhere was Webster's right assigned to it by subrogation. Webster, however, had no right to sue Tomai-Minogue; he had settled with her.

State Farm thus brought an action in Maryland against Tomai-Minogue, a known Virginia resident with no connections to the State of Maryland, for an accident that occurred in the District of Columbia. This suit was filed and pursued to judgment in a Maryland court which, of course, had no power to effectuate valid personal service. The district court attached significance to Tomai-Minogue's failures to respond to letters from State Farm's Maryland office demanding that she pay $200—a fact also alluded to in the majority opinion. She, however, had no obligation to State Farm, which had not even communicated with its insured. She did what most lay persons would have done—she consulted her lawyer. The lawyer told her correctly that even if the claim was meritorious—which it was not—any judgment would be invalid. State Farm and the trial court suggest that she should have jumped into her car and hastened to Maryland in order to enter a special appearance in the state court. That to me simply suggests a bad legal fantasy where laws are designed primarily for the protection of insurance companies and bill collectors. Tomai-Minogue received a rudimentary lecture on our Constitution when she called her lawyer and she had every right to be secure in her thoughts that she could not be harassed on a collection matter whether out of spite, incompetence, or on any other basis. Such intrusion, I feel, is sufficiently serious to be protected by the due process clause of the fourteenth amendment, and she should be allowed to pursue her section 1983 and state law claims against State Farm.