*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 12-CV-107

LUCAS WALL, APPELLANT,

v.

LUCINDA BABERS, ET AL., APPELLEES.

Appeal from the Superior Court of the
District of Columbia
(CAB-2836-11)

(Hon. Anita Josey-Herring, Trial Judge)

(Argued February 19, 2013                     Decided January 2, 2014)

Lucas Wall, *pro se*.

*Richard S. Love,* Senior Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, were on the brief, for appellee.

Before FISHER and EASTERLY, *Associate Judges*, and STEADMAN, *Senior Judge*.

EASTERLY, *Associate Judge*:  After the District of Columbia Department of Motor Vehicles (DMV) declined to renew his driver's license, Lucas Wall sued the District of Columbia and Lucinda Babers in her official capacity as the director of

the DMV. The trial court determined that Mr. Wall had failed to state a claim and granted the District's motion to dismiss the amended complaint under Super. Ct. Civ. R. 12(b)(6). Mr. Wall appealed. Mr. Wall makes a number of arguments, which, when distilled, amount to two claims: (1) that the DMV was required to renew his license; and (2) that he was not given adequate pre- or post-deprivation process when his license was not renewed. We affirm.[1]

## I. Facts

Because we are reviewing an order dismissing Mr. Wall's complaint under Super. Ct. Civ. R. 12(b)(6), we assume all the facts pled in his amended complaint are true. *See Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011). In May 2006, Mr. Wall received a speeding ticket in Maine. At the time, Mr. Wall lived in Boston and had a Massachusetts driver's license. Mr. Wall called the Violations Bureau in Maine, and the prosecutor there agreed to enter a *nolle prosequi* in his case. Shortly after receiving the Maine speeding ticket, Mr.

---

[1] In addition to appealing the trial court's order granting the District's motion to dismiss, Mr. Wall is also appealing the order dismissing his claim against Ms. Babers. Even assuming Mr. Wall could have sued Ms. Babers, apart from the District, in her official capacity, his claims against her would fail for the same reasons his claims against the District fail.

Wall moved to the Washington, D.C. area. Mr. Wall established D.C. residency in February 2007 and received a D.C. driver's license at that time. Mr. Wall maintained a valid D.C. license for four years.

Before his D.C. driver's license expired in 2011, Mr. Wall attempted to renew it online, but he received an error message indicating that he could not do so because there were "stops" associated with his record. After some initial confusion about the cause of the problem, Mr. Wall was told that the stops were related to issues in Maine and Massachusetts. It turned out the traffic case in Maine had never been dismissed. In December 2006, after Mr. Wall had failed to pay the Maine speeding ticket, Maine suspended Mr. Wall's in-state driving privileges[2] and, in December 2009, contacted Massachusetts to request that Mr. Wall's Massachusetts license be suspended. By that time, however, Mr. Wall had exchanged his Massachusetts license for a District of Columbia license, so

---

[2] For nonresidents who possess a license from another jurisdiction, a state may suspend driving privileges. Doing so carries the same consequences as suspending a license for an in-state driver. *See* Me. Rev. Stat. tit. 29-A, § 2461 (1993); *see also* D.C. Code § 50-1403.01 (c) (2012 Repl.) (authorizing the DMV to "revoke the right of any nonresident person . . . to operate a motor vehicle in the District of Columbia, for any cause [it] may deem sufficient"). All subsequent statutory references are also to D.C. Code (2012 Repl.).

Massachusetts could no longer suspend his license; instead, Massachusetts, like Maine, suspended Mr. Wall's in-state driving privileges.

In an attempt to clear up these matters, Mr. Wall contacted authorities in Massachusetts, who told him that his Massachusetts driving privileges would be restored if he resolved his traffic case in Maine. The Maine Violations Bureau told Mr. Wall in turn that he could either pay $260 — the outstanding $210 fine from his speeding ticket plus a $50 fee to restore his Maine driving privileges — or request that the case be reopened. Neither option was attractive to Mr. Wall.[3] Instead, Mr. Wall opted to seek relief in the District of Columbia. He wrote a letter to Ms. Babers explaining why he believed he was entitled to have his D.C. driver's license renewed and he requested that she approve his renewal application. The DMV eventually told Mr. Wall that it could not renew his license "until the matters in Maine and Massachusetts are clear."

The DMV's refusal to renew his expired license prompted Mr. Wall to file suit. In his complaint he asserted that "[n]owhere in DCMR Chapter 18-1 or in the

---

[3] In order to have the case in Maine reopened, Mr. Wall was told he would have to travel to Maine or hire a lawyer to make an appearance on his behalf. In light of the expense, Mr. Wall did not consider fighting his traffic case in Maine "feasible or practical."

D.C. Code is there any authority given to the defendants to refuse a noncommercial driver's license renewal application based on records from another state." Mr. Wall thus took the position that the DMV had no choice but to issue him a renewed license and requested a "mandatory injunction" to compel the DMV to do so. We now review the trial court's order dismissing Mr. Wall's complaint.[4]

## II. Mr. Wall's claim that his right to a renewed license was violated

Mr. Wall argues that, despite the actions taken by Maine and Massachusetts to suspend his driving privileges, the DMV had to issue him a new license and that its refusal to do so gave him a basis to sue. As the foundation for this argument in

---

[4] Because Maine and Massachusetts eventually restored Mr. Wall's driving privileges, and Mr. Wall was then able to obtain a new D.C. driver's license in April 2012, the District argues Mr. Wall's appeal is "largely" moot. We agree that Mr. Wall's request for injunctive and declaratory relief is moot. *See Vaughn v. United States*, 579 A.2d 170, 175 n.7 (D.C. 1990) ("[I]t is well-settled that, while an appeal is pending, an event that renders relief impossible or unnecessary also renders that appeal moot."). But Mr. Wall also seeks monetary damages, which are not necessarily mooted by the issuance of a new license. *See id.* at 175. The District has argued that Mr. Wall has no private right of action for monetary damages under the provisions of the D.C. Code which he alleged the DMV had violated. *See Coates v. Elzie*, 768 A.2d 997, 1002 (D.C. 2001). But Mr. Wall has also sued under 42 U.S.C. § 1983. Section 1983 suits against municipalities have their own limitations, but the District has not briefed these issues for us. We conclude that we need not analyze the intricacies of Section 1983 litigation because we determine that Mr. Wall's suit was properly dismissed on the merits.

the trial court, Mr. Wall argued that the District was broadly violating the D.C. Code and DMV regulations.[5] However, the District's response redirected and narrowed the trial litigation to the meaning and force of the Driver's License Compact (DLC),[6] an interstate compact designed to encourage party states to "consider[] the overall compliance with motor vehicle laws . . . as a condition precedent to the continuance or issuance of any [motor vehicle] license," D.C. Code § 50-1001, and the National Driver Register (NDR), a federal database which facilitates reporting under the DLC. Specifically, the District asserted that it would have been prohibited from renewing Mr. Wall's license under the DLC, an argument which the trial court accepted when it dismissed Mr. Wall's complaint.

On appeal, the District initially defended the ruling it asked the trial court to make. But the District's resort in the first instance to an interstate compact and a federal registry was curious. These are mechanisms to ensure coordination between preexisting state regulatory systems; they are not meant to supplant state systems or create a model regulatory system for states. Accordingly, we asked the

---

[5] Mr. Wall also argued that the District had violated the reporting requirements of the Nonresident Violator Compact (NRVC), an interstate compact which facilitates the transmission of information regarding traffic citations and violations between states.

[6] D.C. Code § 50-1001.

parties to submit supplemental briefs addressing whether Mr. Wall's right to a renewed license and the District's corresponding authority to deny renewal could be discerned not by reference to interstate compacts, but instead by looking to the law Mr. Wall initially asserted the District had violated: the District's statutory and regulatory scheme for the operation of motor vehicles.[7]  With that law as our reference point, we resolve this case.[8]  Examining the trial court's dismissal order

---

[7]  Though "as a general rule, our adversary system is designed around the premise that the parties know what is best for them," *Jones v. District of Columbia*, 996 A.2d 834, 840 (D.C. 2010) (internal quotation marks omitted) (quoting *Greenlaw v. United States*, 554 U.S. 237, 244 (2008)), "when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Id.* (internal quotation marks omitted) (quoting *United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993)).  In these circumstances we are free to rely upon a different rationale than that articulated by the trial court, provided there will be no procedural unfairness to the parties.  There is no such unfairness here because we invited, and received, supplemental briefs from the parties.  We emphasize, moreover, that we are not conducting a review of agency action, in which circumstances we might be unable to affirm on a ground not relied upon by the agency.  We are, instead, reviewing a legal determination by the trial court concluding that Mr. Wall's complaint failed to state a claim upon which relief could be granted.

[8]  Because we are able to resolve this case by looking to the District's statutory and regulatory scheme for the operation of motor vehicles, we see no need to delve into the meaning of the DLC, NRVC or the NDR, or the scope of the District's commitments thereunder.  Whatever additional responsibilities these compacts impose on the District and other member states, they do not limit the preexisting statutory authority we conclude the DMV has (see *infra*) to determine who is qualified to receive a license to drive in the District.

*de novo*,[9] we conclude that Mr. Wall was not entitled to a renewed license. Instead, the DMV had the authority and discretion to require Mr. Wall to clear up his driving record in other states before it issued him a new license.

Driving in the District is thoroughly regulated by statutes and regulations, and the DMV is entrusted with overseeing its regulation. Considering this scheme as a whole,[10] we determine that it was entirely proper under the law for the DMV to rely on the information about Mr. Wall's out-of-state driving privileges, and the DMV had ample authority to deny him a license while his speeding ticket in Maine was outstanding and his driving privileges in Massachusetts were suspended.

The DMV's "primary function" is to set up and implement "programs that serve to ensure the safe and efficient movement of people in the operation of motor vehicles within the District of Columbia." D.C. Code § 50-904; *see also* D.C. Code § 50-902 ("The DMV is charged with helping to improve the District of Columbia's economic competitiveness and quality of life by fostering the safe

---

[9] *See Potomac Dev. Corp.*, 28 A.3d at 543.

[10] *See Hargrove v. District of Columbia*, 5 A.3d 632, 635 n.11 (D.C. 2010) ("'A statute should be read and construed as a whole within the context of the entire legislative scheme.'" (brackets omitted) (quoting *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981))).

operation of motor vehicles on District streets . . . .").  One way the DMV is expected to promote that public safety is through licensing drivers, a function over which the DMV has full authority.  *See* D.C. Code § 50-904 (2)(D) (authorizing the DMV to "[p]rovide all services which pertain to the issuance of driver permits and licensing").  Subject to limited exemptions inapplicable here, every resident who drives a car in the District must have a license from the District to do so.  D.C. Code § 50-1401.01 (d).  That license expires after a set period of time, at which point the driver will not be able to continue to legally drive in the District unless they have obtained a new license through renewal.  D.C. Code § 50-1401.01 (a)(1).  The DMV is given broad discretion to determine who is qualified to receive and retain a license.  Pursuant to D.C. Code § 50-1401.01 (a)(1), the District is permitted to "issue a new or renewed motor vehicle operator's permit" subject to a number of conditions, including "demonstrat[ion] that [the applicant] is mentally, morally, and physically qualified to operate a motor vehicle in a manner not to jeopardize the safety of individuals or property" and "any other conditions the [DMV] may prescribe to protect the public."  The DMV is given broad discretion to revoke or suspend a license "for any cause which [the DMV] may deem sufficient."  D.C. Code § 50-1403.01 (a); *see also* D.C. Code § 50-1403.01 (c) (conferring the same broad authority for the revocation or suspension of driving privileges).

Pursuant to D.C. Code § 50-921, the DMV has authority to promulgate regulations, and these regulations reflect both the DMV's broad authority to issue licenses only to applicants whom the DMV deems competent and the DMV's particular interest in a driver's licensing history. Notably, on every application for a driver's license, two types of information are required: (1) specific identifying information, such as date of birth, sex, and social security number, 18 DCMR § 103.2; and (2) previous licensing history, i.e., "whether the applicant has been previously licensed as an operator and, if so, when and by what state or country; and whether any such license has ever been suspended or revoked; whether an application has ever been refused; and, if so, the date of and reason for the suspension, revocation, or refusal," 18 DCMR § 103.3.[11] It is logical that a suspension of driving privileges in another state would fall under 18 DCMR § 103.3 as the definition of "license" provided in 18 DCMR § 9901 includes "the privilege of any person to drive a motor vehicle whether or not such person holds a

---

[11] This interest in a driver's compliance with the laws of other jurisdictions is also reflected elsewhere in the DMV's organizing statute. *See* D.C. Code § 50-1401.02 (c) (temporarily exempting some nonresidents from the licensing requirements "if they have complied with the motor vehicle registration and licensing laws of the state, territory, or possession of the United States of which they are a legal resident").

valid license issued by the District of Columbia."[12]  In addition to these two types of information, the DMV may request "any other information that the Director may require in order to determine the competency, eligibility, or identity of the applicant."  18 DCMR § 103.4.  Therefore, even if the suspension of driving privileges does not fall under Section 103.3, it is encompassed by Section 103.4.  If the DMV is authorized to require the provision of this information, it certainly may rely on this information to assess whether or not an individual should be permitted to obtain a license in the District.

Further support for the District's broad licensing authority is found in regulations governing suspension and revocation of licenses.  Once a license is issued, the regulations provide that DMV may "suspend, without a hearing, the license of a resident of the District whose driving privileges have been suspended

---

[12]  Mr. Wall argues that the term license only encompasses nonresident driving privileges conferred by the District.  We agree that subsection (d) of the definition of license, which refers to "[t]he privilege conferred upon a nonresident by the laws of the District of Columbia pertaining to the operation by such nonresident of a motor vehicle," is so limited.  But if subsection (d) refers to driving privileges conferred by the District, that indicates that subsection (c) which refers to "[t]he privilege of any person to drive a motor vehicle whether or not such person holds a valid license issued by the District of Columbia," includes driving privileges conferred by other jurisdictions.  Otherwise one of these two subsections would be redundant.

in another jurisdiction." 18 DCMR § 304.4.[13] In determining whether a driver licensed in the District may retain his license, the DMV "may give the same effect to conduct of a resident in another jurisdiction as would be provided by the laws of the District if the conduct had occurred in the District." 18 DCMR § 300.7. Given this regulation, it appears the DMV could have suspended Mr. Wall's license for not appearing at the Maine hearing to resolve the Maine traffic ticket. *See* 18 DCMR § 302.9 ("Failure to appear at a hearing for the administrative adjudication of a traffic infraction pursuant to the District of Columbia Traffic Adjudication Act is grounds for suspension or revocation."). If the DMV could take away, by means of suspension or revocation, a license to drive, then surely, upon expiration of that license it could rely on the same reasons to decline to issue Mr. Wall a new license pursuant to its broad statutory authority to regulate the issuance of licenses in such a way as to protect the public.

Mr. Wall's efforts to refute the DMV's authority and discretion are unpersuasive. To begin with, Mr. Wall contends on appeal that an application for a

---

[13] Mr. Wall challenges 18 DCMR § 304.4 as being outside of the District's statutory authority, but his argument fails. *See* D.C. Code §§ 50-901, 50-921. He also asserts that the regulation fails to afford D.C. licensees adequate process. We need not address this question because Mr. Wall's license was never suspended pursuant to this provision; rather, his license expired. We address Mr. Wall's due process concerns *infra*, Part III.

renewed license is somehow different than a first-time application. We find no support for this assertion. The District grants licenses for a set period of years, after which they expire. *See* D.C. Code § 50-1401.01 (a)(1); 18 DCMR § 110.1. Just before a license expires, a District resident may apply for a new license, but renewal is not automatic. Though the municipal regulations give the DMV the ability to make it administratively easier for residents to renew their licenses, *see, e.g.*, 18 DCMR § 110.3 (giving the DMV authority to extend a license); 18 DCMR § 110.9 (allowing for online renewal in certain situations), the statutes and regulations also make clear that the DMV has the authority to treat renewals just like applications for new licenses, *see* D.C. Code § 50-1401.01 (a)(1) (describing the standards for issuing "new or renewed" licenses); 18 DCMR § 110.5 (stating that the District may require "any or all of the other tests required or authorized upon original application"). Indeed, it would be illogical to treat the renewal of a license differently than the issuance of a license for the first time, given the District's authority to revoke or suspend licenses. If the District has the ability to suspend an individual's active license, it makes little sense to require the District to automatically renew a license with the same deficiencies.[14] *See Hargrove*, 5 A.3d

---

[14] Making an even broader argument, Mr. Wall additionally asserts that, once he submitted a complete application to the DMV, the DMV was obligated to issue him a license and that it was arbitrary and capricious for the DMV not to do so. Mr. Wall cites 18 DCMR § 107.1 for this proposition. Section 107.1 provides

(continued…)

at 635 (rejecting an interpretation of the statute that would be illogical against the backdrop of the full statutory scheme).

Mr. Wall also argues that the District could not decline to issue him a new license pursuant to its broad statutory and regulatory authority to promote "the safety of individuals or property" in the District, *see* D.C. Code § 50-1401.01 (a)(1)(B), because his underlying offense — driving 16 miles over the speed limit — was not that serious, and because, in any event, the suspension of his driving privileges in Maine and Massachusetts was all part of a big misunderstanding because he had been told his Maine traffic violation would be dismissed. But it would be impossible for the District to reinvestigate every out-of-state traffic infraction that appears on the records of its residents. Instead, the District is

---

(…continued)
that the DMV "shall, upon compliance with the requirements of this chapter and payment of the required fee, issue to an applicant a license indicating the type or general class of vehicle(s) the licensee may drive." Mr. Wall interprets this regulation to impose an obligation on the DMV to issue a license whenever an applicant has provided the information requested by the DMV, regardless of what that information says about the applicant's ability to drive. This is an absurd interpretation of section 107.1 and we decline to adopt it. It ignores the clause "upon compliance with the requirements of this chapter," among them 18 DCMR §§ 103.3 and 103.4, which require provision of information about an applicant's driving history and "any other information that the Director may require in order to determine the competency, eligibility, or identity of the applicant." 18 DCMR § 103.4. As discussed, it would make little sense to allow the DMV to request this information but then require the DMV to ignore the information it receives.

entitled to rely on records from out of state regarding Mr. Wall's driving history.[15] These records showed that Mr. Wall had engaged in conduct that resulted in his driving privileges being suspended in two states — information that is unquestionably relevant to his apparent ability and willingness to abide by the rules and regulations regarding the operation of a motor vehicle in the District, and which in turn exist to promote the safety and welfare of D.C. residents.[16]

Accordingly, we determine that the trial court did not err when it held that, as a matter of law, Mr. Wall did not have a claim against the District for refusing,

---

[15] Mr. Wall argues that under the DLC, Maine had an obligation to report Mr. Wall's failure to pay his speeding ticket within 15 days of his conviction and that, having missed this window, it had no "jurisdiction under the compact to later seek . . . assistance . . . in collecting a stale traffic fine from Mr. Wall." Mr. Wall further argues because of Maine's failure to meet its 15-day reporting deadline, the District of Columbia was "required to exclude from consideration any conviction reports that were transmitted among other DLC members [namely Massachusetts] in violation of the 15-day reporting deadline." We acknowledge that the implementing regulations of the DLC include a 15 day "timeliness" requirement, but we see nothing in the compact or its regulations that bars this jurisdiction from considering tardily reported convictions. In the absence of any "express[] requirement" in the DLC, D.C. Code § 50-1001, art. VI, we see no reason that the District could not consider Mr. Walls's driving record in Maine or Massachusetts.

[16] For this reason, Mr. Wall's argument that the DMV could not "enforce other states' nonresident driving privilege suspensions" or act as revenue collectors for other states, is misdirected. There is nothing in this record to indicate that the DMV was acting on behalf of Maine or Massachusetts when it declined to renew Mr. Wall's license. Rather, it appears that the DMV advised Mr. Wall to first resolve issues in those jurisdictions because his previous failure to do so reflected poorly on his willingness to abide by the rules and regulations of the District.

pursuant to its broad discretion, to issue Mr. Wall a new license after his old license had expired.

### III. Mr. Wall's claim that his due process rights were violated

Having determined that the DMV acted within its authority when it refused to issue a license to Mr. Wall after his driving privileges had been suspended elsewhere, we turn to Mr. Wall's second argument that the District did not provide him with adequate process before or after making that determination.

Generally, "[a] discussion of whether a party has a right to procedural due process must start with the question of whether the party has a property interest in the thing taken away." *Zenco Dev. Corp. v. City of Overland*, 843 F.2d 1117, 1118 (8th Cir. 1988). We assume without deciding that Mr. Wall had a property interest in having his license renewed; we consider what process Mr. Wall was due under the circumstances.

"The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it."

*Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (brackets and internal quotation marks omitted). By its nature, due process "is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). It does not require judicial-like proceedings in every case, *see Dixon v. Love*, 431 U.S 105, 115 (1977) ("procedural due process in the administrative setting does not always require application of the judicial model"), nor does it demand that an opportunity to be heard be afforded where the situation demands that no amount of process would affect the outcome for the plaintiff. *See Mathews*, 424 U.S. at 321 (in determining the amount of process that is due, a court must consider the "probable value, if any, of additional procedural safeguards.").


In his complaint, Mr. Wall initially seemed to assert that he was entitled to a pre-deprivation hearing. But in his opposition to the District's motion to dismiss he argued that he had not been given sufficient notice[17] and an opportunity to be heard after the fact to contest the DMV's decision to deny him a renewed

---

[17]  Mr. Wall speaks in terms of notice, but, even though the DMV initially gave him mixed messages about the factual and legal grounds for nonrenewal, he was ultimately informed that the reason the DMV was denying his application for a new license was because his driving privileges had been suspended in Maine and Massachusetts. As discussed below, he did not have a right to a post-deprivation hearing to contest the District's reliance on this information.

license. He asserted that he had a right to a "fair hearing before a neutral decisionmaker where Defendant Babers must show cause for her decision."

If Mr. Wall did not abandon his claim that he had a right to a pre-deprivation hearing, that claim would be foreclosed by *Dixon*. 431 U.S. at 115 (upholding Illinois law allowing for summary revocation of a license and holding that due process did not require a pre-deprivation hearing); *see also Tomai-Minogue v. State Farm Mut. Auto. Ins. Co.*, 770 F.2d 1228, 1236 (4th Cir. 1985) (where appellant's license was suspended based on default judgment in another jurisdiction, she had no right to pre-deprivation hearing). Moreover, we conclude that Mr. Wall, who was invited to reapply for a new license after he had resolved the suspension of his driving privileges in Maine and Massachusetts, had no viable due process claim based on DMV's failure to afford him a post-deprivation hearing before "a neutral decisionmaker."

Mr. Wall seems to argue that he was entitled to such a forum to argue that the DMV could not rely on the Maine and Massachusetts suspensions in making a renewal determination and that it had no choice but to issue him a new license. But as discussed above, the DMV was well within its discretion to consider that Mr. Wall's out of state driving record, and the Full Faith and Credit Clause, U.S.

Const. art. IV, § 1, allows the District to "adopt for purposes of its own compliance with due process, the judgment of a court from another state," *Tomai-Minogue*, 770 F.2d at 1232, rather than hold a new hearing. *See id.* (explaining that "when the Commissioner suspends a license . . . he can rest upon the authenticated copy of the prior judgment as proof that a pre-termination hearing has occurred").[18] Finally, Mr. Wall did not contest that Maine and Massachusetts had suspended his privileges. In short, there were no contested facts that needed to be resolved at a post-deprivation hearing; thus the "probable value . . . of additional or substitute safeguards" in this case is nil. *Mathews*, 424 U.S. at 335. "'If the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute' between the individual and the government agency." *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 945 (10th Cir. 2003) (quoting *Codd v. Velger*, 429 U.S. 624 (1977)); *see also id.* at 943 ("the Constitution does not protect procedure for procedure's sake").

---

[18] To be sure, as the court in *Tomai-Minogue* acknowledged, the "jurisdictional basis of a judgment from another state" would have to be examined before that judgment was "rel[ied] upon . . . to uphold a license suspension." *Tomai-Minogue*, 770 F.2d at 1233. But here, Mr. Wall effectively conceded jurisdiction where he admitted in his complaint that he received a speeding ticket in Maine, that he did not pay it, and that because he did not pay the speeding ticket in Maine, Massachusetts suspended his driving privileges.

For the foregoing reasons, the judgment of the trial court is affirmed.


*So ordered.*